IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
June 8, 2004 Session

## STATE OF TENNESSEE v. RANDY DAVID MILES

**Direct Appeal from the Circuit Court for Franklin County**
**No. 13679     J. Curtis Smith, Judge**

_____

**No. M2003-01492-CCA-R3-CD - Filed September 30, 2004**

_____

The defendant, Randy David Miles, was convicted by a Franklin County Circuit Court jury of two counts of aggravated rape, a Class A felony, and aggravated kidnapping, a Class B felony, for his participation with a codefendant, Gary Allen Phillips, Jr., in grabbing a woman from the street in Northern Alabama and transporting her by car to the defendant's grandmother's abandoned farmhouse in Huntland, Tennessee, where the defendant raped her while his codefendant watched. The defendant was sentenced by the trial court as a Range I, standard offender to concurrent terms of eleven years, nine months for the aggravated kidnapping conviction and twenty-four years, six months for each of the aggravated rape convictions, for an effective sentence of twenty-four years, six months. His Tennessee sentences were ordered to be served concurrently to his Alabama sentence for kidnapping. On appeal, he challenges the sufficiency of the evidence, the State's failure to make a proper election of offenses, and the sentences imposed by the trial court. Following our review, we conclude that one of the aggravated rape convictions is invalid because the facts upon which the State relied to support the separate convictions constitute only one offense. Accordingly, we reverse one of the defendant's convictions for aggravated rape. We affirm the judgments as to the other aggravated rape conviction and the aggravated kidnapping conviction but modify the sentences to twenty-two years and nine years, respectively.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part,**
**Reversed in Part, Sentences Modified**

ALAN E. GLENN, J., delivered the opinion of the court, in which JERRY L. SMITH and JOE G. RILEY, JJ., joined.

Philip A. Condra, District Public Defender, and Francis W. Pryor, Jr., Assistant Public Defender, for the appellant, Randy David Miles.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; James Michael Taylor, District Attorney General; and Steven M. Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

### Trial

The victim testified that she and her boyfriend, Tommy Hickerson, were returning from his softball game to his sister's house in Hazel Green, Alabama, shortly after midnight on May 4, 2000, when their car became stuck in the mud a short distance from the sister's house. After unsuccessfully attempting to extricate the car by hand, Hickerson left for the house on foot to retrieve a "come-a-long" from his sister's garage. The victim waited in the car for about ten minutes and then began walking to the house to help Hickerson search for the tool. Before she reached her destination, however, a car pulled up beside her and a "huge" man she had never seen before, but whom she later identified as Gary Allen Phillips, Jr., got out of the car, grabbed her, and placed her on his lap in the passenger seat of the vehicle. The victim identified the defendant as the driver of the vehicle, but testified she had never seen him before that night either.

The victim, who was very frightened, attempted to get the men to let her go by pointing to a house they were passing and telling them it was her home and they could drop her off there. However, the defendant kept going, speeding down the street, turning onto various roads that the victim did not know, and flying through stop signs and traffic lights. The victim kept looking at the door handle, considering whether she could jump out of the car despite the speed at which they were traveling, until Phillips noticed, opened the car door, and said, "[W]hat you want out, you want out," which scared her. Phillips shut the car door, and the defendant told the victim, "I want to fuck you tonight," to which she angrily responded, "[T]he hell you are." The defendant then told Phillips that he was driving to his grandmother's abandoned house.

After approximately forty-five minutes to an hour, the defendant pulled up to his grandmother's abandoned farmhouse in Huntland, Tennessee, and abruptly got out of the car. At the time, however, the victim did not know where the house was located, as she was unfamiliar with the area and the defendant said only that they were at his grandmother's house. Phillips got out of the car at the same time, pulled her out, and forced her to walk with him and the defendant into the house. Once inside, the victim's clothes were rapidly removed and one of the men said, "[D]o you want her? I'll get her, I'll take her." The victim next found herself pushed down onto a mattress in a dark room with the defendant on top of her attempting to penetrate her and Phillips sitting beside her on the bed. During this time, she repeatedly told the defendant she had to use the bathroom, but he ignored her until she announced she was going to have to go to the bathroom in the bed. At that point, he jerked her up and took her into a bathroom where the toilet collapsed when she sat on it, so that she ultimately had to urinate down her legs onto the floor while the defendant stood beside her holding her arm. She was then "slammed back on the bed" and raped by the defendant for what seemed to her like hours. The victim described the ordeal as follows: " I kept fighting 'em, and fighting 'em and he raped me over and over and over and for so long." The victim was positive it was the defendant who raped her.

The victim testified she fought the defendant throughout and managed to scratch his face. She said she was able to push him off at one point, causing him to withdraw from her. The defendant told her she was making him mad and penetrated her again. The victim testified that the defendant penetrated her vagina with his penis. Phillips was "mumbling back and forth" during this time, and the defendant told her she was making him mad as well, and that she did not want to do that. Phillips, whom the victim described as "huge" and "real creepy looking," then took off his shirt, "scoot[ed] in beside [her]" and began pinching her arms, legs, and stomach while watching the defendant rape her. Phillips also took out a pager, turned on its light, and moved it over her body, saying that he wanted to see what she looked like. At some point while the defendant was raping her, the victim deliberately dropped her hair clip onto the floor beside the bed in the hopes that it would later help the police locate and identify the perpetrators.

The victim testified that when the defendant had finished raping her, he held her in his arms in the bed and told her they were going to lie there until the sun came up, and he would leave when she fell asleep. Phillips was "right beside" her during most of this time. At daylight, the defendant got up and quickly dressed and the victim dressed as well. The defendant then pulled her outside to the car and forced her to sit on his lap in the passenger seat. Before getting into the car, the victim dropped her cigarette pack onto the ground without the defendant noticing, hoping that it would provide additional evidence for the police. Phillips got in the driver's side of the vehicle and they began "flying out" of the area, once again driving down roads that were unfamiliar to the victim. She was frightened and crying, and the defendant kept calling her "a whiny little bitch." At one point, Phillips stopped the car on a gravel road and the defendant took her out of the car and held her by the arm while Phillips went to get gas. When Phillips returned, she and the defendant got back in the car and Phillips continued driving. Phillips and the defendant discussed trying to locate County Lake, and she began crying again because she feared they planned to drown her. At another point, a state trooper passed them as they were traveling on Highway 72, and the defendant, seeing the trooper's approach, "slung [her] . . . in the floorboard." Phillips, who seemed frightened by the appearance of the trooper, then turned onto a side road.

The victim begged the men to let her go, and Phillips said something to the defendant about having a six-mile walk ahead of him. He drove another fifteen or twenty minutes, eventually ending up on a road the victim recognized in the Hunstville, Alabama, area, where he stopped the car, jumped out, and began walking down the road. The defendant ran around the vehicle to the driver's side, got in, and began backing up. The victim pleaded with the defendant to let her get out of the car, and he started telling her again, as he had throughout the entire ordeal, that she was "just one of those little whiny old bitches." She lied, telling him her family was involved in law enforcement, and he asked where she lived and told her he would just drop her off at home, as if, in the victim's words, "it was no big old deal whatever."

The victim testified that the defendant approached a trailer park and she lied again, telling him that it was where she lived. She said he pulled into the drive, stopped the car, and let her out, ordering her not to say anything about what had occurred. After getting out of the car, she cursed him and told him he would not get away with his crime, slammed the car door, and threw a rock into

-3-

his car. At that point, he spun his car around and quickly drove off. She then walked from the trailer park to Hickerson's sister's house, where she immediately reported the kidnapping and rape to the police. That same day, she identified the defendant as the man who raped her by picking his photograph out of a photographic lineup. She identified Phillips the next afternoon by picking his photograph out of a separate photographic lineup.

Sexual Assault Nurse Examiner Beth Taylor, who conducted a forensic medical examination of the victim at the Huntsville Hospital on May 4, 2000, testified she found "a lot of red mud" and multiple bruises and abrasions on the victim's body consistent with a sexual assault, including bruises and abrasions to the victim's knees and inner thighs and a redness to the "posterior fourchette" region of the vagina, or the area immediately below the victim's vaginal opening. She found no tears or lacerations to the victim's rectum. Taylor testified on cross-examination, however, that the victim described having been rectally penetrated twice.

The codefendant, Gary Allen Phillips, Jr., testified he pled guilty to facilitation of aggravated rape and facilitation of aggravated kidnapping in exchange for a twelve-year sentence in the Department of Correction. Although he attempted to minimize his involvement, Phillips corroborated the essential details of the victim's account of the crime, testifying as follows: he and the defendant encountered the victim alone on the road in the Hazel Green/New Market area of Alabama sometime after midnight on May 4, 2000, and took her into their car; the defendant told the victim he was going to have sex with her and she replied, "[N]o, you're not"; the victim tried to exit the vehicle on the passenger side; the defendant drove to his grandmother's house in Huntland, Tennessee, where he raped the victim while Phillips watched; Phillips drove when they returned the victim to the Hazel Green/New Market area the following morning; the defendant shoved the victim to the floorboard when they passed an Alabama state trooper en route; and Phillips got out of the vehicle two and a half to three miles from his home, leaving the defendant alone in the car with the victim.

Phillips' account differed markedly from the victim's only with respect to the role he played in the crime. He testified, for example, that he and the defendant initially stopped with the intention of offering the victim a ride; that the victim was on the ground and told him she had fallen and hurt her ankle; that he "helped her into the car"; and that it was the defendant who pulled the victim from the car into the farmhouse when they arrived in Huntland. Although Phillips acknowledged watching the defendant rape the victim, he denied helping the defendant in any way. He said he left the room at one point and when he returned, the defendant was still raping the victim. Phillips testified that the defendant "had flipped out that night" and speculated it could have been caused by the large amounts of marijuana and alcohol he had consumed. He denied he spent the night in the bed with the victim and the defendant, testifying that he thought he had slept in the living room. He said he used the light from his pager the next morning to find the victim's clothes.

Phillips testified he got out of the car two and a half to three miles from his home in Alabama because he was "disgusted" at what had transpired. He said he told a friend that evening what had occurred and then telephoned the Madison County, Alabama, Sheriff's Department and gave a

-4-

statement to officers. He stated that, as part of his plea agreement in Tennessee, the Alabama authorities agreed to drop the Alabama kidnapping charges against him and he agreed to testify against the defendant in an Alabama court. However, since the defendant had pled guilty to his Alabama kidnapping charge, he had not been required to testify against him, and was therefore under no obligation to testify at the defendant's Tennessee trial. Phillips testified that his trial testimony was accurate to the best of his recollection but that he was very drunk at the time of the crime. He said the statement he gave police on May 5, 2000, was consistent with his current trial testimony.

The friend and next-door neighbor to whom Phillips confided, Bridgett Danielle Edwards, testified that the defendant, whom she knew through Phillips, came to her home on May 4, 2000, and told her he had done something that would get him twenty to twenty-five years and that Phillips had been with him. The defendant would not tell her what he had done and was laughing when he left her house. Later that evening, a very nervous and scared Phillips came to her house, and she asked him what the defendant had done. When he told her, she suggested that he turn himself in. Edwards acknowledged on cross-examination that the defendant told her that Phillips "didn't have anything to do with it, that he'd done it all."

Brent Patterson, a criminal investigator with the violent crimes unit of the Madison County Sheriff's Department in Huntsville, Alabama, testified the victim picked both the defendant's and Phillips' photographs without hesitation from separate photographic lineups, positively identifying the defendant as the man who raped her. Patterson identified a statement he took from Phillips, which was admitted as an exhibit at trial, and testified that he also spoke with the defendant. However, although the defendant agreed to talk to him and Investigator Mike Bell of the Franklin County, Tennessee, Sheriff's Department, he did not want to be videotaped or recorded and refused to sign any written statement, telling the officers that if he did so, he would be unable to later change his story in court. Patterson testified that the defendant told them that the victim had been kidnapped, placed in his vehicle, and driven to his grandmother's abandoned farmhouse in Huntland where he had sexual intercourse with her. According to Patterson, the defendant told the officers that Phillips had "stood by and watched. That he rubbed on the victim's female private areas and that he never actually raped the female." The defendant said that the rape took place over a two and a half hour time period, at different times, and that it involved more than one penetration. He told the officers that he and Phillips returned to Alabama with the victim the following morning and that he shoved the victim, who was struggling at the time, onto the car's floorboard when they passed an Alabama state trooper during the drive. Finally, the defendant told the officers that he would be willing to pay the victim $5000 if she would forget the incident and drop the charges against him. Patterson testified that the defendant pled guilty to aggravated kidnapping in Alabama on November 27, 2001. On cross-examination, he acknowledged that the defendant had described his sexual intercourse with the victim as consensual.

Investigator Mike Bell of the Franklin County, Tennessee, Sheriff's Department corroborated the details of the defendant's statement provided by Investigator Patterson. Bell additionally testified that the defendant told them he felt bad about what happened to the victim, that he was unable at first to get an erection but then had sex with the victim for about two and a half hours, and that the victim

was waving her arms when he shoved her onto the floorboard as the state trooper passed, but that her heart was not pounding "so she wasn't scared and it was all consental [sic]." Bell testified that when he eventually located the farmhouse where the rape occurred, he found the hair clip and cigarette pack in the exact places described by the victim. He acknowledged on cross-examination that no DNA testing had been performed on the evidence collected from the victim's rape kit, but explained that with the overwhelming evidence of "who did what" supplied by the victim's statement and the confessions by Phillips and the defendant, identity was not an issue in the case.

The defendant elected not to testify but presented proof by stipulation that Phillips had told a Huntsville police officer during his initial interview that he was scared because he had a rape case pending against him in Huntsville. The State responded with stipulated proof that the rape charge to which Phillips referred was for statutory rape, included a domestic violence kidnapping allegation, and was never prosecuted because the alleged victim refused to cooperate with police. After deliberating, the jury found the defendant guilty of aggravated kidnapping and two counts of aggravated rape, assessing a $25,000 fine for the aggravated kidnapping conviction and a $50,000 fine for each of the aggravated rape convictions.

## Sentencing Hearing

The defendant's mother and four of his siblings appeared in his support at his February 11, 2003, sentencing hearing, with the defendant's older brother, Clayton Miles, who said he was a divisional director for Krispy Kreme Doughnuts, offering testimony on his behalf. Miles testified that the defendant had been a Krispy Kreme employee for a number of years and had managed a Mobile, Alabama, store for approximately two and a half years. He said the defendant had been employed since high school, sometimes working as many as three jobs at one time. Miles described some of the various jobs the defendant had held, which included operating a lawn service and working at an electronics store, and said he was unaware of any extended period of time in which the defendant had been unemployed.

On March 11, 2003, the trial court filed a memorandum opinion on sentencing, finding the following enhancement factors to be applicable: factors (2) and (3), the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range and the defendant was the leader in the commission of the offense involving two or more criminal actors, applicable to both the aggravated rape and the aggravated kidnapping convictions; factor (8), the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement, applicable to the aggravated rape convictions; and factor (11), the defendant had no hesitation about committing a crime when the risk to human life was high, applicable to the aggravated kidnapping conviction. See Tenn. Code Ann. § 40-35-114(2), (3), (8), (11) (2003). The trial court applied two mitigating factors: the defendant's history of steady employment, and the fact that he voluntarily released the victim alive. See id. §§ 40-35-113(13); 39-13-304(b)(2) (2003). Placing "considerable" weight on the defendant's previous history of criminal behavior and his leadership in the commission of his offenses, less weight on the other two enhancement factors, and "very little weight" on the mitigating factors, the trial court sentenced the

-6-

defendant as a Range I, standard offender to concurrent terms of eleven years, nine months for the aggravated kidnapping conviction and twenty-four years, six months for each of the aggravated rape convictions, to be served concurrently to his Alabama kidnapping sentence.

## ANALYSIS

### I. Sufficiency of the Evidence

As his first issue, the defendant challenges the sufficiency of the evidence in support of his convictions. When the sufficiency of the convicting evidence is challenged on appeal, we must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The indictment charged the defendant with the sexual penetration of the victim by the use of force or coercion and while aided and abetted by Phillips. The aggravated rape statute provides, in pertinent part:

Aggravated rape is unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:

. . . .

(3) The defendant is aided or abetted by one (1) or more other persons; and

(A) Force or coercion is used to accomplish the act[.]

Tenn. Code Ann. § 39-13-502(a)(3)(A) (2003).

The defendant contends that the State failed to prove beyond a reasonable doubt that Phillips aided and abetted him in the commission of the rape, asserting that the evidence at most showed that Phillips was present and failed to stop any unlawful conduct on the part of the defendant. However, when viewed in the light most favorable to the State, the proof overwhelmingly established that Phillips acted as more than a mere observer. The victim described Phillips as "huge" and "creepy looking" and testified that she felt more afraid and intimidated by him than by the smaller defendant. According to the victim's testimony, it was Phillips who grabbed her off the street in Alabama, held her on his lap during the drive from Alabama to Tennessee, and dragged her into the house where the rape occurred. The victim's testimony further established that Phillips provided a coercive, intimidating presence during the rape itself. She testified that when she pushed the defendant off her, he told her that in addition to making him mad, she was making Phillips mad as well, which she did not want to do. Phillips then removed his shirt and crawled onto the bed beside her, pinching her arms, legs, and stomach and inspecting her body by the light of his pager while watching the defendant rape her. Finally, in spite of the defendant's statements to Bridgett Edwards and Investigators Bell and Patterson absolving Phillips of complicity in the rape, he admitted to the investigators that Phillips rubbed the victim's genitals while watching him have intercourse with the victim. Based on this evidence, a rational trier of fact could conclude beyond a reasonable doubt that Phillips aided and abetted the defendant in his commission of the rape.

The defendant additionally argues that the State failed to present sufficient evidence of two separate and distinct rapes, rather than one continuous act. We will address this argument during our consideration of the defendant's election of offenses issue.

The defendant's aggravated kidnapping conviction was based on his unlawful confinement of the victim committed to facilitate the felony of rape. See Tenn. Code Ann. § 39-13-304(a)(1) (2003). With respect to this crime, the defendant concedes he made statements to the victim about his desire for sexual intercourse with her and that he took her to his grandmother's house where the rape occurred. He asserts, however, that "there was little or no proof of force or coercion until reaching the abandoned house" and that his "actual intent to force himself" on the victim did not arise until that time. He argues, therefore, that the State proved him guilty only of kidnapping rather than

aggravated kidnapping because it failed to show beyond a reasonable doubt that the kidnapping was committed to facilitate the later rape.

The State notes that force or coercion is not an element of aggravated kidnapping, and argues that the evidence was more than sufficient to show that the kidnapping was committed to facilitate the rape. We agree. The defendant himself announced his intention at the outset by telling the victim, "I want to fuck you tonight," as he sped from the area of the abduction. At the same time, Phillips was holding the victim on his lap and preventing her escape from the vehicle. Upon their arrival at the farmhouse, the victim's clothes were immediately removed and she found herself thrown onto a bed with the defendant lying on top of her attempting to penetrate her. This evidence overwhelmingly supports the jury's finding that the kidnapping was committed to facilitate the rape. We conclude, therefore, that the evidence was sufficient to support the defendant's convictions for aggravated rape and aggravated kidnapping.

## II. Election of Offenses

The defendant next contends that the State failed to make a proper election of offenses, thereby depriving him of a fair trial. The doctrine of election requires the State to elect the facts upon which it is relying to establish a charged offense when there is evidence at trial that the defendant has committed multiple offenses against the victim. State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001) citations omitted). "The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." Id. at 631 (citing State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999)). The defendant acknowledges he failed to raise this issue in his motion for a new trial, but argues that we should nonetheless notice it as plain error under Tennessee Rule of Criminal Procedure 52(b), which provides that an error affecting the substantial rights of a defendant may be noticed at any time in the discretion of the appellate court where necessary to do substantial justice. Tenn. R. Crim. P. 52(b); State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999); State v. Adkisson, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). Dual convictions resulting in a violation of a defendant's protection against double jeopardy constitute plain error. State v. Robert Wayne Herron, No. M2002-00951-CCA-R3-CD, 2003 WL 151201, at *5 (Tenn. Crim. App. Jan. 22, 2003), perm. to appeal denied (Tenn. 2003).

The defendant argues that the State failed to adequately inform the jury of which two acts of penetration it was electing in support of the two separate counts of aggravated rape. We disagree. During closing argument, the prosecutor referred the jury to the specific portion of the victim's testimony upon which it was relying to support the two aggravated rape convictions:

> We charge two counts of aggravated rape. Rape is the sexual penetration and if you'll recall [the victim's] testimony she said she was able to push him away several times and I had to get personal and I had to ask her, does that mean that he withdrew from you and then penetrated again? And she said, yes. So he was indicted and charged

with two counts and there are at least two sexual penetrations here, and the State elects and chooses to proceed with her very testimony where she said she pushed him away, he withdrew, only to do it to her again. That is at least two counts of aggravated rape.

However, we agree with the defendant that the above set of facts does not establish two separate and distinct rapes. "[S]eparate acts of intercourse may be so related as to constitute one criminal offense." State v. Phillips, 924 S.W.2d 662, 664-65 (Tenn. 1996). The Phillips court provided the following list of factors to be considered when determining whether a defendant's behavior constitutes one continuous act or separate and distinct offenses:

> 1. The nature of the act;
>
> 2. The area of the victim's body invaded by the sexually assaultive behavior;
>
> 3. The time elapsed between the discrete conduct;
>
> 4. The accused's intent, in the sense that the lapse of time may indicate a newly formed intent to again seek sexual gratification or inflict abuse; and
>
> 5. The cumulative punishment.

Id. at 665. "[T]he presence and absence of any one factor or a combination of them other than the nature of the act is not determinative of the issue." Id.

In the portion of the victim's testimony relied on by the State in its election of offenses, the victim described the episode as follows:

> Q    Okay. Tell us the best you can what transpired at that point.
>
> A    He . . . . I kept fighting 'em, and fighting 'em and fighting 'em and he raped me over and over and over and for so long.
>
> Q    You're talking about who did this to you?
>
> A    Yes, [the defendant] did.
>
> Q    Was this one continuous penetration, . . .
>
> A    (Interposing) No.

-10-

Q   Or was there some stopping points along the way?

A   The only time we stopped was when I tried to push him off of me.

Q   And were you successful in getting him off of you?

A   Maybe like just barely, not even . . . .

Q   Enough to where he actually withdrew from you?

A   Yes, sir.

Q   And once you would push him away and he would - - -

A   (Interposing) And he - - he kept saying - - I'm sorry.

Q   I was just going to ask once you pushed him away and he withdrew from you, what did he do again?

A   He kept saying you're making me mad, you're - - why are [you] being like this, you're making me mad, you're pissing me off. He kept trying to flip me over, well, there's a wall right here and I take my foot and push my foot off the wall and by this time I was scared I was more mad than anything, and I - - it went on like that forever and ever, just fight him off, fight him off, and I scratched his face.

Although the victim described her ordeal as seeming to last "forever and ever," the second penetration referenced by the prosecutor appears from her testimony to have occurred within a relatively short period of time of the first. Furthermore, both were acts of penile penetration, involved the same orifice, took place in the same bed, and appeared to have occurred in the same body positions. Nothing in the victim's description indicates that enough time elapsed for the defendant to have developed a newly formed intent to rape prior to the second penetration. Therefore, we conclude that the evidence elected by the State was sufficient to support only one of the aggravated rape convictions. Accordingly, we reverse one of the defendant's two convictions for aggravated rape on double jeopardy grounds.

### III. Sentencing

As his final issue, the defendant challenges the sentences imposed by the trial court, asserting that they are excessive and unsupported by the evidence. We will consider these claims.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations

made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The burden rests with the defendant, as the party challenging the sentences, to establish that the sentences imposed by the trial court are erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

As a Range I offender, the defendant's Class A felony of aggravated rape subjected him to a sentence ranging from fifteen to twenty-five years, while his Class B felony of aggravated kidnapping subjected him to a sentence ranging from eight to twelve years. See Tenn. Code Ann. § 40-35-112(a)(1)(2) (2003). Procedurally, the trial court starts with a presumptive sentence at the midpoint in the range for a Class A felony and at the minimum in the range for a Class B felony, increases the sentence within the range based upon the existence of any applicable enhancement factors, and then reduces the sentence as appropriate based on applicable mitigating factors. Id. § 40-35-210(c), (d), (e) (2003) The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of 1989 Sentencing Act and its findings are adequately supported by the record. Id. § 40-35-210, Sentencing Commission Cmts.; State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

In reviewing the defendant's sentences, we first must consider the opinion of the United States Supreme Court in Blakely v. Washington, __ U.S. __, 124 S. Ct. 2531 (2004), which was released after the oral arguments in this matter. In Blakely, the court determined that, under the rule explained in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348 (2000), a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence," upon the finding of certain statutorily enumerated enhancement factors, could not be enforced because "every defendant has the *right* to insist that the prosecutor prove to a jury all facts legally essential to the punishment." __ U.S. at __, 124 S. Ct. at 2543 (emphasis in original). The opinion has resulted in a blizzard of varying, and often inconsistent, interpretations as to its effect on federal and state

sentencing procedures. Because of the likelihood of further appellate review in this matter, and the fact that Blakely's effect on the Tennessee sentencing acts has not been finally determined, we will consider, in light of the Blakely holding, each of the sentencing factors applied by the trial court in the present appeal.

According to the presentence report, the defendant had prior convictions in 2001 in Huntsville, Alabama, for "kidnap adult-sexual assault,"[1] for which he received a fifteen-year sentence, with three years of incarceration, four years of probation, and the remainder of the probation to be unsupervised; and in 1995 in Madison County, Alabama, for assault, for which he received a sentence of confinement for 180 days, followed by one year of probation, as well as a fine in an undisclosed amount.

The trial court based the application, to both the aggravated rape and aggravated kidnapping convictions, of enhancement factor (2), the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the range, on the defendant's misdemeanor assault conviction in Alabama; his admission of marijuana usage since the age of twenty-three and admission of having been under the influence of marijuana and alcohol when he drove the victim to Tennessee; and his willful failure to pay child support, which the trial court noted constituted the crime of nonsupport in Alabama.[2] See Ala. Code § 13A-13-4. Even if Blakely does not allow enhancement based upon the defendant's use of marijuana and alcohol and failure to support his children, the record fully supports the trial court's application of this factor based upon his prior criminal record, as well as the weight ascribed to it. The decision in Blakely does not affect this determination.

Enhancement factor (3), the defendant was a leader in the commission of an offense involving two or more criminal factors, cannot be applied, as we will explain. At the time of the crimes, the defendant was thirty-six years old while his codefendant was only nineteen. In finding the defendant "without doubt" the leader in the commission of the offenses, the trial court noted this vast age difference as well as other factors, including the fact that the defendant had control of the vehicle, verbalized his intention to rape the victim, drove the victim to his grandmother's house, committed the actual rape, and took the victim back to the area in which he had kidnapped her in Alabama after Phillips had already exited the vehicle. Based on these factors, the trial court concluded that "the defendant was the dominant personality and dominant force" in the crimes. However, we conclude that the application of enhancement factor (3) to the aggravated rape and aggravated kidnapping convictions is not permitted by Blakely, for it relies upon a finding made solely by the court.

The trial court found enhancement factor (8), the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement, applicable to the aggravated

---

[1] This was the Alabama kidnapping conviction based on the May 4, 2000, events involving the same victim, to which the defendant pled guilty on November 27, 2001.

[2] According to the presentence report, all of the defendant's children were residents of Alabama.

-13-

rapes but entitled to less weight than the previous two enhancement factors. Likewise, the holding in <u>Blakely</u> does not permit application of this factor, for it relies on a determination made solely by the court.

The trial court found enhancement factor (11), the defendant committed the crime when the risk to human life was high, applicable to the aggravated kidnapping conviction based on the evidence that the defendant drove at a rapid rate of speed for approximately one hour over the public roads of Alabama and Tennessee at a time when he was under the influence of alcohol and marijuana, thereby endangering the life of the victim as well as the lives of other motorists in the area. Since application of this factor depends on findings made solely by the court, <u>Blakely</u> does not permit its use.

Finally, the trial court found the defendant's employment history and the fact that he released the victim alive to be applicable as mitigating factors, but entitled to only minimal weight. We can find no error in these determinations.

Thus, as the result of the United States Supreme Court's ruling in <u>Blakely</u>, we conclude that the only enhancement factor which can be applied is enhancement factor (2), to which the court ascribed great weight. Considering this factor, and the two mitigating factors which were given scant weight, we conclude that the defendant's sentence for the aggravated rape conviction should be reduced from twenty-four and one-half years to twenty-two years and his sentence for the aggravated kidnapping conviction from eleven years and nine months to nine years.

## CONCLUSION

We conclude that the evidence supports the defendant's conviction for aggravated kidnapping but that the facts elected by the State support only one rather than two, separate convictions for aggravated rape. Accordingly, we affirm the aggravated kidnapping conviction and one of the convictions for aggravated rape and modify the sentences, respectively, to nine years and twenty-two years. We reverse the second aggravated rape conviction.

_____
ALAN E. GLENN, JUDGE

-14-